IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHEYLA ZAPATA-ALVAREZ,           :            CIVIL ACTION
        Plaintiff,                :
                          :
      v.                          :
                          :
CAROLYN W. COLVIN,               :
Commissioner of Social Security, :
        Defendant.                :            No. 14-2830

## REPORT AND RECOMMENDATION

**LINDA K. CARACAPPA**
**UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Sheyla Zapata-Alvarez brought this action under 42 U.S.C. § 405(g),

seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's claim for supplemental security income ("SSI") under Title

XVI of the Social Security Act ("Act").  Presently before this court are plaintiff's request for

review, the Commissioner's response, and plaintiff's reply.  For the reasons set forth below, we

recommend that plaintiff's request for review be GRANTED in part and DENIED in part.

I.      FACTUAL AND PROCEDURAL HISTORY

        On October 21, 2011, plaintiff protectively filed an application for SSI.  (Tr. 183-

188).  On December 19, 2011, the Social Security Administration denied plaintiff's claim.  (Tr.

70-74).  Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ").

        On December 6, 2012, ALJ John F. Gehring held a hearing, and plaintiff as well

as an impartial vocational expert, Donna Nealon, testified.  (Tr. 39-59).  Plaintiff was represented

at the hearing by Nathan Tinkey, Esq.  On December 27, 2012, the ALJ issued an opinion

finding plaintiff not disabled under the Act since October 21, 2011, the date the application was

filed.  (Tr. 33).  Plaintiff filed a request for review, and on April 2, 2014, the Appeals Council

denied the request for review, making the ALJ's decision the final decision of the Commissioner.

(Tr. 1-6).  Plaintiff subsequently commenced this civil action with the assistance of counsel.

II.    LEGAL STANDARDS

Upon judicial review, this court's role is to determine whether the ALJ's decision

is supported by substantial evidence.  42 U.S.C. § 405(g); Pierce v. Underwood, 587 U.S. 552

(1988).  "Substantial evidence is more than a mere scintilla but may be somewhat less than a

preponderance of the evidence."  Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).

Moreover, it is relevant evidence viewed objectively as adequate to support a decision.

Richardson v. Perales, 402 U.S. 389, 401 (1971); Kangas v. Bowen, 823 F.2d 775 (3d Cir.

1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979).  In determining whether

substantial evidence exists, the reviewing court may not weigh the evidence or substitute its own

conclusion for that of the ALJ.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).  If the court

determines the ALJ's factual findings are supported by substantial evidence, then the court must

accept the findings as conclusive.  Richardson, 402 U.S. at 390; Plummer v. Apfel, 186 F.3d 422,

427 (3d Cir. 1999).  It is the ALJ's responsibility to resolve conflicts in the evidence and to

determine credibility and the relative weights to be given to the evidence.  Richardson, 402 U.S.

at 401.  While the Third Circuit has made it clear that the ALJ must analyze all relevant evidence

in the record and provide an explanation for disregarding evidence, this requirement does not

mandate the ALJ "to use particular language or adhere to a particular format in conducting his

analysis."  Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).  Rather, it is meant "to ensure

that there is sufficient development of the record and explanation of findings to permit

meaningful review."  Id.  Moreover, apart from the substantial evidence inquiry, a reviewing

court must also ensure that the ALJ applied the proper legal standards.  Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To establish a disability under the Act, the claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period."  Stunkard v. Sec'y of Health and Human Services, 841 F.2d 57 (3d Cir. 1988) (quoting Kangas, 823 F.2d at 777); 42 U.S.C. § 423(d)(1) (1982).  The claimant satisfies his burden by showing an inability to return to his past relevant work.  Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Rossi v. Califano, 602 F.2d 55, 57 (3d Cir. 1979) (citing Baker v. Gardner, 362 F.2d 864 (3d Cir. 1966)).  Once this showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  20 C.F.R. § 404.1520.  See Rossi, 602 F.2d at 57.

As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity if any.  If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (references to other regulations omitted).

III.    ADMINISTRATIVE LAW JUDGE'S DECISION

Pursuant to the five-step sequential evaluation process for adults, the ALJ determined that plaintiff had not been under a "disability," as defined by the Act, since October 21, 2011, the date the application was filed.  (Tr. 23-33).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since October 21, 2011, the application date.  (Tr. 27).  At step two, the ALJ found that plaintiff had the following severe impairments: bipolar disorder, panic disorder, PTSD, chronic low back pain, obesity, and asthma.  (Tr. 25).  In proceeding with the sequential evaluation, the ALJ cited to the following medical records throughout his opinion, which we have independently reviewed and summarize as follows:

Dr. Arturo Ferreira, M.D. performed a medical consultative examination of plaintiff, on July 7, 2011.  Dr. Ferreira reported that plaintiff was alert and oriented times three, her speech was clear and fluent, and her mood and affect were normal.  Dr. Ferreira also noted that plaintiff showed good memory and concentration, and was able to follow directions and showed no difficulty understanding instructions.  (Tr. 279).

On July 19, 2011, Daniel A. Schwarz, Ph.D., a state agency examiner, performed a psychological consultative examination.  (Tr. 286-292).  Plaintiff explained that she was abused by the father of her children, whom she dated from the age of fourteen through the age of twenty-two.  (Tr. 286).  Plaintiff stated that her anxiety symptoms started during childhood.

Plaintiff explained that she sees a psychiatrist once per month and a therapist once per week. Plaintiff attended school in Puerto Rico through eighth grade, and was in regular education class but received special help for reading and math.  Plaintiff told the examiner that she can cook and clean independently but goes shopping with her children only.  Plaintiff has three friends and they call her and ask if she needs anything.  Plaintiff reported that she can read and write in Spanish.  (Tr. 288).  Plaintiff's mood was with significant anxiety and depressive symptoms secondary to past abuses from the father of her children.  Plaintiff's thoughts were goal-directed and spontaneous in Spanish only.  Plaintiff was preoccupied with her medical and psychiatric condition, and stated that she hears things.  Plaintiff was oriented to person, place, and time. Concentration was into the borderline range.  Plaintiff knew that 5 + 4 equals "9" and that 9 + 4 equals "13".  Plaintiff did not know how much 5 x 4 and 9 x4 equals.  Judgment was fair but abstract and reasoning were in the borderline range.  Dr. Schwarz diagnosed plaintiff with posttraumatic stress disorder and rule out learning disorder, not otherwise specified.  (Tr. 289). Plaintiff was given a Global Assessment Functioning ("GAF")[1] score of 55[2].  Dr. Schwarz completed a medical source statement and indicated that plaintiff had moderate difficulty in the ability to understand and remember short, simple instructions and carry out short, simple instructions.  Plaintiff had marked limitations in the ability to understand, remember, and carry

---

1 While the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–V") has discontinued the use of GAF scores, GAF scores remain medical evidence.  GAF scores were used by "mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults." Irizarry v. Barnhart, 233 Fed App'x 189, 190 n.1 (3d Cir. 2007).  A GAF score is not considered to have a "direct correlation to the severity requirements, 66 Fed. Reg. 50746, 50764-65 (2000); however, a GAF score constitutes medical evidence and must be addressed by the ALJ in making the disability determination.  Watson v. Astrue, No. 08-1858, 2009 WL 678717, at *5 (E.D. Pa. Mar. 13, 2009) (*citing* Colon v. Barnhart, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006)).  See also Dougherty v. Barnhart, No. 05-5383, 2006 WL 2433792, at *9 (E.D. Pa. Aug. 21, 2006).
2 A GAF score of 31-40 indicates "some impairment in reality testing or communication... or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  A GAF score of 51-60 indicates "moderate symptoms (e.g. flat effect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) at 32.

out detailed instructions.  Plaintiff also would have marked difficulty appropriately interacting

with others, responding to work stress and changes in a routine work setting.  (Tr. 291).

On October 7, 2011, Dr. James A. Wrable, Ph.D., completed a psychological

vocational evaluation.  (Tr. 293-308).  The ALJ summarized Dr. Wrable's evaluation as follows:

> The claimant reported that her mother still lives in Puerto Rico and is ill,
> this causes stress for the claimant because she is unable to help her mother.
> She also noted that her father passed away 19 years ago from falling, getting
> an infection and not seeking medical treatment.  She stated this haunts her to
> this day.  She noted that sometimes, as a child, she dreamed that people were
> injured and covered in blood.  She recalled a normal, happy childhood until
> age 12 when she began to date a guy who eventually became the father of
> her 3 children.  He was 6 years older than her and at age 14, she left her
> parent's home to live with him.  He eventually became abusive in every way
> but she was told by her father that since she disobeyed her parents that she
> had to stay in the relationship.  She reported that she eventually began to use
> drugs, marijuana and pills, to cope with her feelings and anxiety.  The
> claimant reported that she used to hit herself in the stomach while pregnant
> in attempts to lose the pregnancies.  She noted that all of her children were
> born premature and have mental/emotional problems.  She feels guilty about
> this.  After the relationship ended, he went to jail, and she left, she found her
> way to Philadelphia and had 2 additional failed romantic relationships.
> She indicated her 3 children live with her, as well as grandchildren and an in-
> law. Despite the many persons in the household, most of them adults, no one
> helps her financially.  She stated she is behind on her mortgage and is fearful all
> the time.  She also has anger that she is the only one dealing with the bills.  She
> recalled a brief work history at fast food places and a furniture warehouse.  She
> reported her jobs never lasted long and she was always fired due to her poor
> memory skills and lack of focus.  She has not worked in the last 10 years and
> finds it too embarrassing, overwhelming and frustrating to begin work only to be
> fired shortly thereafter.  She reported hearing voices and gunshots that apparently
> no one else hears.  She noted the voices in her head tell her to kill herself and she
> took an overdose of medication on three separate occasions but lived.  The
> claimant was able to perform basic addition, but no subtraction, multiplication or
> division.  She admits to periods of non-compliance with taking her medications
> and treatment.  The diagnoses included bipolar disorder, mixed, severe with
> psychotic features, panic disorder with agoraphobia, and post traumatic stress
> disorder.  She was given a GAF score of 40.  A medical source statement was
> completed indicating the claimant was not functioning adequately at present and
> would not be able to work in her current mental status condition
> In response to a question via email from the claimant's representative, Dr.
> Wrable wrote that since the claimant was Spanish speaking only, she was given
> a non-verbal IQ test, the Raven's Progressive Matrices (RPM) which is accepted
> by SS for non-English speaking individuals.  He explained that "the non-verbal
> tests do not give specific IQ numbers like the WAIS or Stanford Binet but
> instead, based on the raw and percentile scores received categorize the
> individual with labels such as Average, Above Average and in this case
> Mentally Deficient which is considered on this test to be comparable to a IQ
> score (the score from all 10 subtests in the WAIS) of 75 or lower. That's
> the most that can be concluded from this or other such tests.

However, the percentile score derived on the RPM allows for comparison to the standard 10 tests that also derive Percentile Scores. In this case, Ms. Alvarez's percentile score was <5 or below the 5% level as compared to the 10 of the General Population. The below 5% level on the WAIS corresponds with 10's in the Mild Range of Mental Retardation in the same way that the Above 5% level corresponds to those individuals in the Genius Range of Intelligence. It's basically that simple. We don't get a 10 number from the RPM but we can infer from the Percentile Rank her likely range of Intellectual functioning since scores on one test are equal to other tests (given generally accepted mathematical and statistical properties.)"

On this evaluation, Dr. Wrable also had the Scale Scores on the WRAT-3 to help in determining just how low below 5% Ms. Alvarez's scaled scores, when averaged, came out to be about .3 and her standard scores were 57 and below (below 70 being in the Mentally Retarded range.) A scale score of .3 would suggest to Dr. Wrable that the individual was functioning severely low and easily in the Mentally Retarded range considering that a score of 5 would place them in the Borderline Range of Intelligence and a score of 10 would be Average Intelligence. In other words, she is severely low, almost nil, if one considers this score.

(Tr. 28-29, citing Exhibits C8F and C16F ).

Treatment records from Juniata Community Mental Health Clinic show that plaintiff was seen from January 15, 2009 through March 10, 2012.  (Tr. 331-368, 533-605).  On January 15, 2009, plaintiff was given a diagnosis of major depression, recurrent and a GAF score range of 60-70.  (Tr. 368).  It was noted that plaintiff was agitated and anxious, but cooperative. Plaintiff had normal intelligence.  Plaintiff's thought process was normal and logical.  It was indicated that plaintiff had auditory perception, however, it was also noted that this was questionable.  (Tr. 366).  Plaintiff was seen monthly for medication checks and discussed her relationships and the difficulties she had at home.  Plaintiff reported being depressed and anxious, and that plaintiff's children were stressing her out.  As indicated by the ALJ, plaintiff reported feeling better in September 2010, being okay in October 2010, and then mentioned added stress due to family and financial issues in November 2010.  (Tr. 352-353).  Throughout 2011 and 2012, plaintiff consistently reported financial and familial stressors.  (Tr. 336- 342, 370-371).

Plaintiff also had weekly therapy sessions at Juniata Community Mental Health Clinic.  (Tr. 428- 605).  Plaintiff again consistently discussed that her family and financial situation were stressors.  The ALJ noted that plaintiff reported to be medically compliant with no medical evidence of side effects from medication.

Continuing with the five step analysis, the ALJ moved onto step three.  At step three, the ALJ found plaintiff does not have an impairment, or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 416.920(d), 416.925 and 416.926).  (Tr. 25).

At step four, the ALJ found that plaintiff has the residual functional capacity to perform light work except plaintiff should not climb ladders or scaffolds, should avoid hazards such as dangerous machinery and unprotected heights.  Plaintiff should avoid excessive exposure to extremes in temperature, humidity, fumes, odors, and dust.  Mentally, plaintiff can understand, remember, and implement simple one to two step instructions and can be occasionally exposed to the public. (Tr. 27).  The ALJ considered all symptoms and the extent to which the symptoms could reasonably be accepted consistent with the objective medical evidence and other evidence.  Further, the ALJ considered opinion evidence.  (Tr. 27).

Finally, at step five the ALJ found that plaintiff has no past relevant work.  However, the ALJ found that there are jobs that exist in significant numbers in the national economy that plaintiff can perform.  (Tr. 32).  Thus, the ALJ determined that plaintiff has not been under a "disability," as defined in the Social Security Act, since October 21, 2011, the date plaintiff's application was filed.  (Tr. 33).

IV.    PLAINTIFF'S CONTENTIONS

Plaintiff argues that: (1) the ALJ erred in finding plaintiff's mental impairment

did not meet listing 12.05B or C; (2) the hypothetical to the VE was deficient; and (3) the ALJ

failed to follow the requirements of SSR 00-4p because the ALJ did not ask the VE about a

conflict between the VE's testimony and information contained in the Dictionary of

Occupational Titles ("DOT").

V.      DISCUSSION OF MERITS

The Commissioner's findings must be affirmed if they are supported by

substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

1420, 1427 (1971). The role of this court is to determine whether there is substantial evidence to

support the Commissioner's decision. Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992),

cert. denied, 507 U.S. 924, 113 S. Ct. 1294 (1993). In coming to a decision, it is the ALJ's

responsibility to resolve conflicts in the evidence and to determine credibility and the relative

weights to be given to the evidence. Richardson v. Perales, supra.

In the case at bar, the ALJ determined that medical evidence established plaintiff's

bipolar disorder, panic disorder, PTSD, chronic low back pain, obesity, and asthma were "severe"

impairments within the meaning of the Regulation. (Tr. 25). The ALJ further found that

plaintiff had the residual functional capacity to perform light work except plaintiff should not

climb ladders or scaffolds, should avoid hazards such as dangerous machinery and unprotected

heights. Plaintiff should avoid excessive exposure to extremes in temperature, humidity, fumes,

odors, and dust. Mentally, plaintiff can understand, remember, and implement simple one to two

step instructions and can be occasionally exposed to the public. (Tr. 27). The ALJ determined

that there are jobs that exist in significant numbers in the national economy that plaintiff can

perform. (Tr. 32). After review of the records, this court finds that portions of the ALJ's

decision were not supported by substantial evidence. As such, plaintiff's request for review

should be granted in part and the case be remanded to the Commissioner.

A. Whether the ALJ erred in finding plaintiff's mental impairment did not meet Listing 12.05C.

Plaintiff alleges that the ALJ erred in finding plaintiff's mental impairment did not meet listing 12.05B or C because plaintiff had a valid IQ score of 57. Plaintiff claims that the ALJ erred in disregarding plaintiff's IQ score of 57 that was reported by Dr. James A. Wrable, Ph.D. Plaintiff claims that due to plaintiff's IQ score of 57, the ALJ should have found plaintiff disabled under listing 12.05. The Commissioner responds by asserting that the ALJ adequately supported the decision to not accept plaintiff's IQ scores because they were inconsistent with the record.

At step three, the ALJ must determine whether the plaintiff's severe impairment matches, or is equivalent to, one of the listed impairments. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). If the plaintiff's impairment is equivalent to a listed impairment, then the plaintiff is *per se* disabled and no further analysis is necessary. Id. (internal citations omitted). Listing 12.05 for intellectual disability[3] refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R., Part 404, Subpart P, Appendix 1 § 12.00. The plaintiff bears the burden at step three, and in order to meet Listing 12.05, the plaintiff must meet both this introductory criteria of "deficits in adaptive functioning" prior to age 22 as well as the criteria of one of paragraphs A through D. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; Gist v. Barnhart, 67 Fed. App'x 78, 81 (3d Cir. 2003) ("before demonstrating the specific requirements of Listing

---

[3] On August 1, 2013, SSA amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." See 78 Fed. Reg. 46499-01, 2013 WL 3936340 (effective September 3, 2013). However, the change was based on the negative connotations associated with "mental retardation" and does not change the definition of the disorder. Id. at 46500.

12.05C, a claimant must show proof of a 'deficit in adaptive functioning' with an initial onset

prior to age 22).  To satisfy "paragraph B" of 12.05, the plaintiff must have "[a] valid verbal,

performance, or full scale IQ of 59 or less."  20 C.F.R., Part 404, Subpart P, Appendix 1 §

12.05C.  To satisfy "paragraph C" of 12.05, the plaintiff must have a "valid verbal, performance,

or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an

additional and significant work-related limitation of function."  20 C.F.R., Part 404, Subpart P,

Appendix 1 § 12.05C.

      Although plaintiff's IQ score was 57, as required by Listing 12.05 (B), the

regulations require valid scores, and it is well-settled that an ALJ is not required to accept a

claimant's IQ scores and may reject scores that are inconsistent with the record.  Markle v.

Barnhart, 324 F.3d 182, 186 (3d Cir.2003).  In determining whether an IQ score is valid, i.e, an

accurate reflection of a claimant's intellectual abilities, the ALJ is to consider the entire record

before him.  Markle, 324 F.3d at 186.

      As explained above, Dr. Wrable completed a psychological-vocation evaluation

of plaintiff, and found plaintiff had mild mental retardation, and reported that plaintiff's test

results indicated that plaintiff was functioning in the mentally deficient or cognitively impaired

range.  In response to plaintiff's attorney's request for clarification, Dr. Wrable responded that he

administrated a non-verbal intelligence test known as the Raven's Progressive Matrices (RPM),

because plaintiff's primary language was Spanish, and that the RPM is approved by Social

Security for non-English speaking individuals, but does not give specific IQ numbers.  Plaintiff's

percentile score was < 5 or below the 5% level as compared to the IQ of the general population,

and that placed plaintiff in the mild range of mental retardation, which is indicated by an IQ

score of 70 or below.  Dr. Wrable also had the scale scores on WRAT-3 to help determine how

low below 5% plaintiff was, and the scores showed that plaintiff's standards scores were 57 and below, which would suggest plaintiff was functioning severely low and easily in the mentally retarded range.  (Tr. 606-607).

   The ALJ considered listing 12.05 and found that plaintiff did not meet the criteria for "paragraph B" or "paragraph C".  The ALJ explained that for "paragraph B", plaintiff does not have a valid IQ score of 59 or less.  In regards to "paragraph C", the ALJ found that plaintiff does not have a valid IQ score of 60 through 70 and  a physical or other mental impairment imposing an additional and significant work-related limitation of function.  Further in the opinion, the ALJ reviewed all of the medical evidence and the IQ results from Dr. Wrable were given no weight.  The ALJ explained that the results used to reach Dr. Wrable's conclusion were ambiguous and inconsistent with the other detailed treating medical evidence.  The ALJ then went on to discuss the remaining treating medical evidence.

   As noted above, the ALJ needs to consider the entire record when determining if an IQ score is valid.  The ALJ provided substantial support for the decision to give Dr. Wrable's finding no weight.  The ALJ noted that Dr. Schwarz performed a psychological consultative examination and completed a medical source statement on July 19, 2011.  While Dr. Schwarz noted the need to rule out some sort of learning disability, Dr. Schwarz found that plaintiff was capable of understanding, remembering and carrying out simple instructions but not detailed instructions.  Dr. Schwarz noted that plaintiff displayed significant anxiety and depressive symptoms secondary to past abuse from the father of her children.  Additionally, the ALJ explained that records from Juniata Community Mental Health document plaintiff's treatment since 2009 for anxiety and depression.  Plaintiff consistently reported the stress that she experienced dealing with her children, their lack of discipline, respect, and lack of financial

assistance.  Plaintiff was diagnosed with major depression recurrent.  The ALJ also considered the opinion Dr. Arturo Ferreira, M.D., who performed a medical consultative examination on July 7, 2011.  Dr. Ferreira, reported that plaintiff was alert and oriented times three, her speech was clear and fluent, and her mood and affect were normal.  Dr. Ferreira also noted that plaintiff showed good memory and concentration, and was able to follow directions and show no difficulty understanding instructions.  Finally, the state agency psychological consultant, Dr. James Vizza, Psy.D., found on December 12, 2011 that plaintiff is capable of performing, simple, routine, repetitive work in a stable environment.  The ALJ gave Dr. Vizza's opinion significant weight.

Dr. Wrable found that plaintiff was mildly mentally retarded, however, that is the only finding in the entire medical record that indicates that plaintiff has an intellectual disability. Plaintiff's lengthy therapist treatment records do not indicated that plaintiff is intellectually disabled.  Dr. Schwarz found that plaintiff's information intelligence was in the borderline range and diagnosed plaintiff with post-traumatic stress disorder and rule out learning disability not otherwise specified.

Contrary to plaintiff's argument at bar, the ALJ did not substitute his own lay opinion for the opinion of Dr. Wrable.  The ALJ explained that Dr. Wrable's findings were inconsistent with the medical record as a whole.  The ALJ summarized the above listed medical records in support of the ALJ's decision to give Dr. Wrable's findings no weight.  In giving Dr. Wrable's findings no weight, the ALJ found that the plaintiffs did not have a valid IQ score of 70 or under.  As such, the ALJ did not err in not finding plaintiff disabled at step three under listing 12.05.  We find the ALJ's analysis at step three to be supported by substantial evidence and recommend that this claim be denied.

13

B.  <u>Whether the hypothetical question to the vocation expert was deficient</u>

At the fifth and final step of the above mentioned analysis, plaintiff challenges the sufficiency of the ALJ's hypothetical to the vocational expert ("VE").  Plaintiff argues that the hypothetical to the VE was deficient.  Plaintiff argues that the ALJ should have included additional mental limitations in the hypothetical, based on the opinions of Dr. Wrable and Dr. Schwarz.

The residual functional capacity ("RFC") assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities despite the limitations caused by his or her impairment(s).  20 C.F.R. § 404.1545(a); see also Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  The ALJ's finding of RFC must be supported by a clear statement of the facts upon which the assessment is based.  Id. (citing Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).  Moreover, the RFC must consider all functional limitations, including mild limitations from impairments that the ALJ has previously determined to be non-severe.  Curran v. Astrue, 2012 WL 5494616, at *5 (E.D. Pa. Nov. 13, 2012) (finding that the ALJ erred by failing to include mild functional limitations related to plaintiff's non-severe impairment of depression in the hypothetical posed to the vocational expert) (citing Ramirez v. Barnhart, 372 F.3d 546, 554–555 (3d Cir. 2004); Washington v. Astrue, 2009 WL 855893, at *1 (E.D. Pa. Mar. 31, 2009)).

The ALJ found that plaintiff had the residual functional capacity to perform light work except plaintiff should not climb ladders or scaffolds, should avoid hazards such as dangerous machinery and unprotected heights.  Plaintiff should avoid excessive exposure to extremes in temperature, humidity, fumes, odors, and dust.  Mentally, plaintiff can understand, remember, and implement simple one to two step instructions and can be occasionally exposed

to the public.  (Tr. 27).  The ALJ's hypothetical to the VE was whether jobs excited in the national economy for "an individual of the same age as the claimant who has the same educational background and past work experience.  And further assume that this individual retains the residual functional capacity for light work but with the following additional limitations: remember simple one or two step instructions; there's no climbing ladders or scaffolds; no working at heights; no working around hazardous machinery; no excessive exposure to fumes, dust, odors, temperature, or humidity extremes; and only occasional exposure to the public."  (Tr. 53).

In order for a vocational expert's answer to a hypothetical question to be considered substantial evidence, the question must reflect all of a claimant's impairments that are supported by the record.  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question portrays the claimant's individual physical and mental impairments.  Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).  However, in eliciting testimony from a VE, the ALJ's hypothetical need not contain every impairment alleged by the claimant, but must only convey all of the claimant's credibly established limitations. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).  Where the record contains medically undisputed evidence of a specific impairment not included in the hypothetical, the expert's response is not considered substantial evidence.  Podedworny, 745 F.2d at 218.

In the case at bar, the ALJ included all of the limitations from his residual functional capacity assessment in the hypothetical to the VE.  The ALJ was not required to include additional limitations found by Dr. Wrable.  As thoroughly explained above, the ALJ

gave no weight to the opinion of Dr. Wrable. The ALJ adequately explained that he was giving Dr. Wrable's opinion no weight because it was inconsistent with the medical records and then the ALJ summarized the medical records. The ALJ was not required to include limitations found by Dr. Wrable in the hypothetical to the VE.

Plaintiff further argues that Dr. Schwarz, whose opinion the ALJ credited, found that plaintiff also would have marked difficulty appropriately interacting with others, responding to work stress and changes in a routine work setting. Plaintiff argues that the ALJ should have included the limitations found by Dr. Schwarz in the hypothetical question to the VE. However, the ALJ did not credit Dr. Schwarz entire opinion. The ALJ gave less weight to Dr. Schwarz's opinion that plaintiff would have marked difficulty appropriately interacting with others, responding to work stress and changes in a routine work setting, because there was no supporting evidence in plaintiff's recent mental health treatment records for the finding that plaintiff has marked difficulty interacting with others. As summarized above, the ALJ explained that majority of plaintiff's treatment records focused on plaintiff's experiencing stress from her children and from plaintiff's lack of finances. The court notes that plaintiff's recent treatment records from Juniata Community Mental Health did focus on plaintiff's familial and financial stressors and there were no indications that plaintiff's had marked difficulty in appropriately interacting with the coworkers or supervisors. The ALJ adequately explained that the records don't support limitations in interacting with the coworkers, and responding appropriately to work stress. The ALJ was not required to include all of the limitations noted by Dr. Schwarz.

Additionally, plaintiff argues that Dr. Vizza, whose opinion the ALJ gave significant weight, made similar findings of plaintiff's difficulty to accept criticism from supervisors, to get along with coworkers or peers, and to respond appropriately to changes in a

work setting.  Dr. Vizza did indicate that plaintiff was moderately limited in the above listed areas; however, Dr. Vizza explained in narrative form that even with those limitations, plaintiff is able to maintain socially appropriate behavior and that the impairments do not preclude plaintiff from performing the basic mental demands of competitive work on a sustained basis. The ALJ credited Dr. Vizza's opinion and considered all of the medical records as a whole in determining plaintiff's residual functional capacity.  The ALJ did not err in not including the above mentioned items that Dr. Vizza indicated presented moderate limitations because Dr. Vizza then explained the findings further.

Additionally, plaintiff argues that the hypothetical was flawed because the ALJ's residual functional capacity finding was that plaintiff can understand, remember, and implement simple one to two step instructions, but the hypothetical only indicated that plaintiff can remember simple one to two step instructions.  The court does not see that the two are different. The ALJ was clearly limiting plaintiff to work involving simple one to two step instructions in both instances.

Finally, plaintiff argues that because plaintiff is unable to communicate in English, the ALJ was required to include a language limitation in the hypothetical to the VE. The ALJ noted that plaintiff is unable to communicate consistently in English.  The ALJ's hypothetical to the VE did not, however, provide that plaintiff is unable to communicate in English.

The Commissioner argues that a plaintiff's inability to speak English in not per se disabling.  Additionally, the Commissioner argues that the VE was present at the hearing, and saw that plaintiff needed the assistance of a Spanish-English interpreter to communicate, thus plaintiff's ability to communicate in English is irrelevant to the ALJ's finishing in the case at bar.

Plaintiff is not claiming that her inability to speak English is per se disabling. Plaintiff argues that the fact that plaintiff cannot speak English should have been presented as a factor in the hypothetical to the VE.  While the court notes that the VE was present at the hearing, the court cannot assume that the VE took plaintiff's inability to communicate in English into consideration when determining if there were jobs in the national economy that plaintiff could perform.  The VE responded to the ALJ's hypothetical, which did not include the fact that plaintiff cannot communicate in English, when answering if there were jobs that an individual with plaintiff's limitations could perform.  An ALJ may consider the testimony of a vocational expert in response to a hypothetical question only if the question accurately portrays the claimant's physical and mental limitations.  See Podedworny, 745 F.2d at 218.  Because the ALJ's hypothetical did not include an English language limitation, the court cannot determine whether the VE's response to the question reflected plaintiff's inability to read, write, or speak English.  Accordingly, this issue should be remanded to the ALJ for further consideration of plaintiff's inability to communicate in English.

C.   Conflict Between Vocational Expert's Testimony and Information in the
Dictionary of Occupational Titles

Plaintiff argues that the ALJ failed to follow the requirements of SSR 00-4p because the ALJ did not ask the VE about a conflict between the VE's testimony and information contained in the Dictionary of Occupational Titles ("DOT").  Plaintiff alleges that the ALJ erred by finding plaintiff able to perform work as a sorter, marker, and inspector/packer because the ALJ failed to resolve the conflict between the DOT descriptions of the  jobs' reasoning levels and the restriction on plaintiff given to the VE by the ALJ.  Plaintiff explains that the ALJ's hypothetical to the VE placed a reasoning restriction on plaintiff that plaintiff can remember simple one to two step instructions.  Plaintiff argues that according to the DOT the positions of

sorter, marker, and inspector/packer require greater reasoning skills then those imposed by the

ALJ's limitation jobs with simple one to two step instructions.  Plaintiff states that a limitation of

simple one to two step instructions allows for only level 1 reasoning skills.  Plaintiff further

argues that according to the DOT all three jobs identified by the vocational expert require level 2

or 3 reasoning skills, which require the ability to carry out "detailed" instructions, which exceeds

the ALJ's residual functional capacity finding based on its limitation to "simple one to two step

instructions."

        SSR 00–4p provides guidance to resolve conflicts between the DOT and

occupational evidence provided by a VE.  SSR 00–4p, at 1. The Administration explained that

"[w]hen there is an apparent unresolved conflict between vocational expert or vocational

specialist evidence and the DOT, the adjudicator must elicit a reasonable explanation for the

conflict before relying on the vocational expert or vocational specialist evidence to support a

determination or decision about whether the claimant is disabled."  Id. at 2. The Third Circuit has

interpreted SSR 00–4p to require that the ALJ question the VE on the record about the existence

of any conflict, "elicit a reasonable explanation" where such a conflict appears, and explain in

the decision "how the conflict was resolved."  Burns v. Barnhart, 312 F.3d 113, 127 (3d

Cir.2002).  The Third Circuit has further held that an ALJ's failure to comply with the

requirements of SSR 00-04p may result in a remand of a claim by the district court. Rutherford

v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005).  However, the Third Circuit instructed that

remand is only appropriate where the VE's testimony is inconsistent with the DOT and there is

no other substantial evidence in the record to support the ALJ's decision. Id.; see also McHerrin

v. Astrue, 2010 WL 3516433, *5 (E.D. Pa. 2010).

The DOT lists all jobs available in the national economy and the skill requirements necessary to perform each job.  SSR 00-4p,at 8.  In particular, the Specific Vocational Preparation ("SVP") defines the skill level required for the job, while the General Education Development ("GED"), which includes Reasoning Development, Mathematical Development, and Language Development, provides informal and formal educational requirements.  DOT, App. C; see also McHerrin, 2010 WL 3516433, at *9 (discussing the relevant sources in assessing plaintiff's ability to perform past work in light of limitations).  The reasoning development requirement within the GED is at issue here.  The SVP levels listed in the DOT also correspond with the Code of Federal Regulations' three categories of work – unskilled, semi-skilled, and skilled – however; the regulations do not specify reasoning requirements and do not correspond with the reasoning development levels in the DOT.  McHerrin, 2010 WL 3516433, at *9.  Therefore, we note that the reasoning development requirement is a factor to consider in addition to the classification of unskilled work.

In the DOT, a job with reasoning level of 3 requires skills to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations."  DOT, App. C.   A job with reasoning level 2 is defined as the "ability to apply common sense and understanding, to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations." DOT, App.C.  A job with a reasoning level of 1 requires skills to "[a]pply commonsense understanding to carry out simple one-or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."  DOT, App. C.

In the case at bar, there is a conflict between the VE's testimony and the information contained in the DOT.  In response to the ALJ's hypothetical which included restrictions limiting plaintiff to light work but with the following additional limitations: remember simple one or two step instructions; there's no climbing ladders or scaffolds; no working at heights; no working around hazardous machinery; no excessive exposure to fumes, dust, odors, temperature, or humidity extremes; and only occasional exposure to the public, the VE stated that plaintiff could perform sorter, marker, and inspector/packer jobs.  The DOT describes a sorter (DOT code 573.687-034), marker (DOT code 209.587-034), and inspector/packer (DOT code 784.687-042) to require a reasoning level of 2.  The limitation of "simple one or two step instructions" most closely corresponds with a level one (1) reasoning level requirement, which provides: "Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."  DOT, App. C.  In comparison, a level two (2) reasoning level requirement would be incompatible with the limitation expressed in this case because a level two requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations."  DOT, App. C.

Defendants argue that the Commissioner's policy and practice is to rely on SVP skill levels and not the DOT reasoning levels. Thus, defendants claim that there was no conflict because the jobs identified by the VE were unskilled, and correlated to an SVP level of two, a skill level which plaintiff's RFC indicates she could perform.  However, as the court explained in McHerrin, "a number of courts have found the DOT's reasoning levels are much more indicative

of whether the claimant is capable of performing more than simple, repetitive tasks." McHerrin, 2010 WL 3516433, at 6.

Here, the ALJ determined that plaintiff can perform jobs that involve simple one or two step instructions.  The ALJ accepted the testimony of the vocation expert that plaintiff can perform the representative occupations of sorter, marker, and inspector/packer, all requiring reasoning level of 2 or 3 according to the DOT.  The VE's testimony that plaintiff can perform the above representative occupations is inconsistent with the ALJ's determination that plaintiff be limited to simple one or two step instructions.  Because the ALJ did not inquire of the VE how plaintiff can perform these jobs, which have reasoning levels of 2 and 3, while the ALJ restricted plaintiff to simple, one or two step instructions, a conflict exists.  A remand is appropriate so that the ALJ can explain these inconsistencies.  Accordingly, this issue should also be remanded to the ALJ for further consideration of vocational expert testimony.

Therefore, this court makes the following:

RECOMMENDATION

AND NOW, this 16th day of April, 2015, it is RESPECTFULLY RECOMMENDED that Plaintiff's Request for Review be GRANTED in part and DENIED in part.

BY THE COURT:

_/S LINDA K. CARACAPPA   ___
LINDA K. CARACAPPA
UNITED STATES MAGISTRATE JUDGE